## Case No. 14,850.

UNITED STATES v. CONYNGHAM et al.

[Wall. C. C. 178; 4 Dall. 358.] [1]

Circuit Court, D. Pennsylvania.    Oct. Term, 1801.

EXECUTION—ALLOWING DEBTOR TO RETAIN PROPERTY LEVIED ON—SUBSEQUENT EXECUTION.

Where a creditor having levied on the personal property of his debtor, instead of selling the property as soon as it can reasonably be done, allows the debtor to retain possession of it for an unreasonable length of time, such execution is fraudulent as respects a subsequent one, and the property may be levied on and sold under such subsequent one.

[Cited in The Roslyn, Case No. 12,068.]

This was a question addressed to the court, respecting the priority of two executions, interfering with each other. A case was stated, which was shortly this. John Travis and others having obtained judgment in the supreme court of Pennsylvania, against F. and I. West, laid a fi. fa. on their household goods, and about twenty-eight days afterwards, assigned the judgment bona fide, and for a valuable consideration, to the defendants in this cause. The sheriff, by the consent and approbation of Travis and Conyngham, allowed the goods to remain about thirteen months in the possession of the Wests, when they were levied on by the marshal of this court, by virtue of an execution, at the suit of the United States. The question for the decision of the court was, whether the goods of the Wests, thus circumstanced, were liable to the suit of the United States.

Rawle & Dallas, for the United States, contended, that the defendants having omitted to proceed with their execution till after the levy, and leaving the goods in the possession of the Wests, for so long a time, had lost their lien, and the property had become liable to the execution of the United States. From Twyne's Case [3 Coke, 80], to the present day, a party's being allowed to remain in possession of goods, after title passed to another, has been considered a badge of fraud, and the goods have been held subject to a subsequent execution. The principle of the decision, and policy of the law, applies equally to the case of property seized in execution, and left in possession of the former owner. In both cases indicia of ownership, are separated from the reality of it, and both alike mislead the public and encourage fraud. The cases from the books, put both cases on the same ground. See 1 Ves. Sr. 245; 1 Wils. 44; Rice v. Serjeant, 7 Mod. 37, in point. 10 Vin. Abr. 561, pl. 18; Peake, 65; 1 Salk. 320; Carth. 420; 3 Ves. 38; 1 Ld. Raym. 251; Cowp. 434; Prec. Ch. 285.

The defendant's counsel, Levy & Lewis, denied that the law was settled in England so broadly as the plaintiff's counsel insisted,

---

[1] [Reported by John B. Wallace. 4 Dall. 358, contains only a partial report.]

for in the cases cited of interfering executions, the first execution creditor, after delivering his writ to the sheriff, had forbidden him to proceed, or had by some act or direction prevented him; while in the present case, the defendants had been merely quiescent; the sheriff, to be sure, acted with their approbation and permission, but not by their direction. But farther; all the authorities concur, that leaving the goods in the owner's possession, is but evidence of fraud; it is not a fraud in itself. No actual fraud is alleged. But admitting that the law is in England as it is stated, it is not so in Pennsylvania. A series of cases, and the ancient, general usage of the state, has settled it differently: and with us, a creditor may take goods in execution under a fi. fa. and without proceeding to sale, leave them in possession of the debtor, without losing his lien, provided it be done through indulgence, and not with any actual fraudulent intent. Levy v. Wallis [4 Dall. (4 U. S.) 167], in the supreme court in 1799, was the case of a testatum fi. fa. to Lycoming county, to March, 1799. The sheriff, by virtue of it, "levied upon twelve horses." Upon the return of the fi. fa., Ingersoll, on behalf of A. B. of Lycoming, objected to it, that these same horses had been levied on, twenty or twenty-two months before, under a fi. fa. by his client. Wallis had been allowed to remain in possession the whole time, and had actually sold two of the horses levied on under the first fi. fa. The question was made, whether the first execution creditor had lost his lien. The court was full, and considered the point so settled, that they would not allow an argument. The chief justice said, that it had been the practice ever since he had been at the bar, that an execution creditor leaving the goods in the debtor's possession from motives of humanity, or as an indulgence, and not for an actual fraud, should not be postponed to a subsequent execution. Steinhauer v. Witman [1 Serg. & R. 438,] in the supreme court in 1798, was this. A fi. fa. in the suit of Swift v. Witman [unreported], had been levied on the defendant's goods; but they were allowed to remain in his possession. Afterwards came Steinhauer's fi. fa., and upon the question of priority, the chief justice expressed his displeasure that the point should be raised. Yeates, J., said that the rule in England was, that an execution creditor by allowing the goods to remain in the debtor's possession, lost his lien as against a subsequent execution: yet that such a rule would not do here, that ours was a young country, where money was not easily to be raised on a sudden; and that it would be productive of great inhumanity and distress, to oblige a creditor to sell his debtor's goods immediately; thereby creating a rush of the creditors, and breaking him up, when by a little indulgence, which the creditor might wish to give him, he would be able to discharge the debt. He said that "there was

a distinction between an execution creditor leaving goods in the debtor's possession, and a purchase under a bill of sale; the former may, and generally does do it, from motives of humanity; the latter must have a fraudulent motive." These cases do not so much settle the law, as prove that it has been long settled and acted under. It has become the common law of Pennsylvania, and by the laws of the United States—1 Story's Laws, 114 [1 Stat. 142]—this court will observe it. It will be adhered to in the state courts, and infinite inconvenience will be produced if discordant decisions should take place in the different courts.

In reply, it was said that the rule was not so firmly established in Pennsylvania, nor to the extent supposed by the defendant's counsel. Collins v. Earle [unreported] was opposed to it; this case was in the common pleas, in 1791, before President Biddle. Collins levied fi. fa. on Earle's property, but entered an order on the sheriff's docket, that he was not to sell unless another execution came. Johns afterwards levied another execution on the same goods, and they were sold, and the money brought into court. Judge Biddle heard the question argued at large, and then expressed his clear opinion, that the first execution was to be deemed fraudulent in law; and Johns accordingly took the money. Page v. Cook [unreported] was a similar case of interfering executions. It arose before Judge Coxe, and his decision was similar to Judge Biddle's. He said that Rice v. Serjeant, 7 Mod. 37, settled the question in England, and that the law must be the same in Pennsylvania. The counsel of the United States had notes of the cases which they said could be entirely relied on for authenticity and accuracy.

THE COURT remarked that this was an important case, and declined giving an opinion till the following term, when they did so as follows:

[Before TILGHMAN, Chief Judge, and GRIFFITH, Circuit Judge.]

TILGHMAN, Chief Judge. I think it may be taken for granted, that by the principles of the common law (Twyne's Case, 3 Coke, 80b); and by the stat. of 13 Eliz. c. 5, adopted in this state, and practised under, before and since the Revolution, the conduct of the defendants would be considered as attended with those circumstances, which induce a legal presumption of fraud. When I use the word fraud, it is understood that no actual misconduct or immorality is ascribed to Messrs. Conyngham, &c., who are gentlemen of fair character, and have acted in this business, in all probability, solely from principles of friendship and humanity. This construction of the common law, and of the stat. 5 Eliz. was not disputed by Mr. Levy, who argued for the defendants, nor has it been questioned by the supreme court of Pennsylvania, whose opinion I very much respect.

That opinion, cited and relied on by the defendant's counsel, is the only circumstance which raised the least doubt in my mind. It is contended, that we are bound by the decision of the supreme court of Pennsylvania, by the 34th section of the act to establish the judicial courts of the United States on the laws of the several states, except where the constitution, treaties, or statutes of the United States provide otherwise. I will not now deliver any opinion, whether the laws of the several states here spoken of, are to be understood to be the acts of the several state assemblies as expounded by their judicial decisions, and not the decisions of the state courts on principles of common law. At all events, it will not be contended that we are bound by the opinions of the state courts on common law points, unless their decisions have been ancient, universal and without variation—so as truly to constitute the law of the land. We have kept this cause under advisement since January last, in order to make inquiry into the decisions of the Pennsylvania state courts. I have inquired, and from the best information I have been able to procure, the point has never been decided in the high court of errors and appeals; nor is it understood as established, in the extent contended for by the defendants' counsel, in the several county courts of Pennsylvania. I am warranted in saying this, by the opinion of the late Judge Biddle, and of the present Judge Coxe, both of the most respectable legal abilities. Indeed, the supreme court themselves, struck with the pernicious consequences, which might result from a general principle, that a plaintiff might suffer goods seized by a fi. fa. to remain in the hands of the defendant as long as he pleased, did in the case of Chancellor v. Phillips, 4 Dall. [4 U. S.] 213, decide, that a bona fide purchase without notice, of a parcel of bricks thus left in the hands of the defendant, should hold them against the plaintiff. This decision appears to me to have shaken the principle contended for by the defendants. It is contended that this principle still continues in force, with respect to household goods; but for what reason are household goods to be distinguished from other things? Are they not equally valuable? Do they not equally hold out to the world, an idea of false credit? Do they not encourage the entering up fraudulent judgments, for the purpose of being protected by a fi. fa. laid on them. It is said that there is no false credit, because it appears from the records of the court, that the goods have been taken in execution. True, it does appear so; but when the goods have remained a long time in the hands of the defendant, without sale, the fair and reasonable presumption is, that the execution has been satisfied, and there is no obligation on either party, to make this satisfaction matter of record, supposing it to have taken place. If the principle contended for prevails, in what situation are we? An execution for a small sum, may protect property to a large amount.

If the goods remain, in point of law, in custody of the sheriff of the county of Philadelphia, the marshal of the United States cannot touch them by virtue of process from this court, and thus they may be protected at the pleasure of the plaintiff in the state court. But if it is granted that the goods are not in the custody of the sheriff, I think the point, on the part of the defendant, is abandoned. On the whole, I am of opinion that by the principles of the common law, and the stat. of 5 Eliz., which in fact, was no more than an affirmance of the common law, the property in question was liable to the execution of the United States. And I am also of opinion, that the defendant has not shown such an uniform, consistent, universal train of decisions, in the courts of Pennsylvania, as will warrant this court in departing from the principles of the common law.

GRIFFITH, Circuit Judge. Upon principles of the common law, nothing is more settled, than that a possession of chattels is prima facie evidence of property in the possessor; yet mere possession does not always subject the real owner, who is out of possession, to be deprived of his right by the disposition of the possessor, or the process of law: goods hired, or loaned, or in possession of another by the pledge or mortgage of the owner, or which have come to one as trustee, or by finding, or fraud, or tort—are protected during the continuance of the loan or hiring, the pledge or mortgage, the trust, fraud, or tort against third persons who purchase or take them in execution, or found any claim against the real owner, on the ground of such possession; but in all these cases, it will be perceived, that the possession of the goods in the other is consistent with the ownership of him out of possession; there is nothing which can raise a presumption, when the truth is made known, that the real property is not in him who claims it: but if the real owner permits the goods to remain after the period of the hiring or loan is expired, or the pledge after it is redeemed, or with the trustee, after the trust expired, or with the finder or spoliator after discovery, and neglects an unreasonable time to assert and reclaim his property, third persons, who bona fide purchase, or by process of law seize on such goods, will hold it against the real owner. This is allowed on the broad principles of public policy. What innumerable evils would follow, were it allowed for one man to appear the owner of property transferable by delivery—act as such—receive credit, and draw into confidence the world under such appearances, and when called upon to make good his engagements, to tell those who trusted him that he was all along a pauper, and that what he appeared to be was a mere disguise, a snare laid for the ruin of unsuspecting creditors. To avoid the mischiefs resulting from such contrivances, policy dictates, and the law says, that let a man's in-

tentions be what they may, and be ever so good and meritorious, yet he shall not be allowed to assist another in holding out appearances of property, to the injury of third persons; the only difficulty lies in settling what shall be an unlawful or fraudulent departing with possession by the true owner, so as to give him who comes in under the person in possession a superior or better right. I have before stated, that it is lawful to lend or to hire, and that if property is pledged or mortgaged, the pawnee or mortgagee may hold it securely; and so in the other cases, with this limitation, that if left by the owner in possession of another an unreasonable length of time after his right to reclaim or demand it accrues; and third persons, acting upon a supposition of property in the possessor, purchase or take it in execution, their right shall be preferred. What is a reasonable time, and what circumstances would in such cases give the character of legal fraud to the possession, are questions of law, to be determined as they arise, by a careful application of it to the particular case. There are certain cases perfectly settled, as coming within the description of constructive fraud: for instance, if A. sells goods absolutely to B., and yet B. permits the vendor to remain in possession and use the goods as before, though such sale was bona fide, and a valuable consideration as for money, or the payment of a debt; and afterwards A. sells the goods, or they are taken in execution, such sale or execution will be good against B.; for it is wholly inconsistent with the nature of the transaction, that after an absolute sale from A. to B., that A. should keep the goods; and use them as his own (3 Coke, 80; 2 Bulst. 218; 2 Term R. 585; Id. 594; Id. 587; 3 Esp. 54); the law therefore avoids such sales as fraudulent, preferring the title of him who makes a real purchase or lawful seizure, and takes possession, to his, who, though his purchase was honest, yet did not carry it into effect, but permitted the vendor to hold out the property as his own, and thereby deceive mankind into a belief that they were trusting to something real. The cases decided on this principle are innumerable; nor is it enough that the parties to such a transaction effect a nominal transfer, or color the sale by appearances of acting upon and executing the bargain and sale agreeably to the terms, if in truth and fact no real possession is taken, and no fair and reasonable execution of the sale, or transfer, of whatever nature, or for whatever purposes it may pretend to answer, is designed or effected. It may seem harsh to say, that a bona fide sale shall be deemed fraudulent. In general, where sales are made, and the vendor continues in possession, they are not bona fide, but fraudulent, in fact; that is, designed to cover the property; but the law is the same, where there is a valuable consideration and a good intent, if thereby third persons, as purchasers and creditors, are, or are liable to be drawn in and deceived; this is constructive or legal fraud

—not inferred from the intent of the parties. but from the nature and consequences of the act. This principle of the common law, (for the statutes against fraudulent conveyances are merely in affirmance of it,) has been applied to the case of executions and seizures under them. There are cases establishing this position, that if one creditor obtains a judgment and issues execution, and takes the goods of his debtor on the fi. fa., and there voluntarily rests, if another takes out an execution and seizes the same goods, and proceeds to sell them, he shall be preferred who last seized and sold. This is so held upon the most obvious reasons of justice and policy—it is held to be fraudulent in law. A creditor who sues and gets judgment and issues execution against his debtor, acts wholly inconsistently with all his legal rights and his prior conduct. if, after seizing the goods, he suspends, or assents to the suspension of an actual sale for the satisfaction of his debt; his conduct is equally hostile to the debtor, if he takes the goods and keeps them locked up, and to other creditors, if he permits them to remain with the owner, to be used as before; it is plain, that his only object in levying his execution was to gain a preference, without in fact proceeding to execution. This the law will not permit, for many obvious reasons. In the first place, if a creditor may issue his execution, and then hold a preference, without proceeding to a sale. he may thereby completely fetter the property, of whatever amount: he may equally ruin the debtor, and prevent other creditors from obtaining their just rights; for while goods are held under one execution, and while that has a lawful preference, no other execution seizing the same goods can be executed. 4 Term R. 640. Again, if the creditor may, by a mere delivery of his execution first, and seizure, without going further, gain a preference over all subsequent process. this would in effect be giving to the first judgment a priority in case of goods; for where is the difference, whether a second creditor is defeated and delayed by a first execution not executed, or by a judgment on which no execution has been issued. The statute has declared, that in the case of chattels, the first execution shall have priority; but if that execution is not pursued, it is a plain fraud on the act, and ought to have no other preference than the judgment itself: and lastly, if the goods are only seized and left in possession of the debtor, this gives rise to all those consequences, to a certain extent, for which sales are avoided by innocent purchasers and creditors, where the vendee has left the property with the vendor: he uses them as his own— he gains credit, is trusted on that account; and perhaps the prospect of the fund, which apparently belongs to him, may induce the creditor to forego other means of obtaining satisfaction. In short, there seems the utmost wisdom and equity in the common law, which uniformly holds that a second fi. fa. shall be preferred to a first not carried into execution;

but here, as in every other case depending on the common law, great care must be observed to apply it correctly: that whilst the principle is recognised, we are certain the case comes under it. The question is, what is such a delay of execution, or what such a possession of the property by the defendant, as will constitute it fraudulent and void against a later fi. fa? Where the plaintiff manifests a desire to pursue his execution, or where, in other words, the delay, or the allowing the defendant to hold possession of the goods, results from the officer alone, I should be sorry to lay it down, that a later fi. fa., coming to another officer, should for that reason, be preferred; where the executions are in the hands of the same officer, no dispute on this subject—that is of laches in the officer—can often occur, for he will be equally delinquent in regard to all. There may possibly be also other circumstances intervening, which would form a reasonable ground upon which to hold a preference once gained, though some delay on the part of the plaintiff, or the defendant has been left some time in possession: these will be judged of as they arise, making all allowances for the peculiar circumstances of the parties, the state of society, the usages of the country, and the obstructions of a legal kind, retarding or entangling the parties in their pursuit of justice. But there must be no designed or intentional delay of execution: but where an execution is taken out, and the party who issues it either directs it not to be executed till a certain time, or until further orders, or assents to, or approves of the property continuing in the possession of the debtor as before, beyond the time reasonably required for the sale of it; if another execution comes to the same officer, or to another during the orders for suspension, or after the goods have continued more than a reasonable time in the possession of the defendant, with the plaintiff's approbation, I make no hesitation to say, the law is and ought to be, that the second execution gains the preference, and either the same officer or another may go on to execute it and pay the moneys to the second creditor; and so a third may come in and gain the preference over the second. But what is a reasonable time for making execution? This will often vary with circumstances—a week or ten days—or so much as would enable the officer to give sufficient notice of the sale after the seizure, would be allowed; but in general this is the affair of the officer, and though he should give more than was necessary, yet if not with the assent of the plaintiff, a subsequent execution coming in would not prejudice the first creditor's execution: it is where the execution of the writ is procrastinated by the connivance or privity of the party, and in the interim another execution comes, that he loses his preference. Taking these principles for a guide, what doubt can remain in this case? Here the plaintiffs took out a fi. fa., which was levied under their own eyes—the property could have been sold in twenty-four hours;

they not only assent but approve of the delay of execution and permit the party to keep the possession as before, for a whole year, and for aught that appears, would never have executed it. In the mean time, the United States issue execution, and seize on these goods in the possession of the defendants. It is clear that this delay was not from the sole act of the officer; no steps were taken to compel the execution; on the contrary, it is expressly stated, that they approved of his suspending execution, and leaving the property, with the defendants in the first action. This then, was an execution, fraudulent in law as against the second. The party who sued it out did not enforce it; it was merely nominal; it did not operate, nor was intended to operate according to its purport: the judgment remained unexecuted, and as much so as if no fi. fa. had issued, and as against the second fi. fa. should have no preference. We have been pressed with the decisions of the state courts. I feel the utmost deference for their great equity and correct principles; but I am not satisfied that the question has been so fully settled as has been represented: no printed case is produced. Some accounts are given of an unsatisfactory kind of opinions, and a general understanding on this head; but I cannot collect from any decision in the supreme court of this state, that it has been solemnly settled as law, that a first creditor may sue out an execution—seize the goods—leave them in possession of the debtor, and consent to and approve of their remaining there an indefinite time. It is to this extent, the law has been stated as understood in Pennsylvania. But that cannot be so; for it goes to establish this monstrous proposition, that the first execution creditor may seize the whole property, and under cover of it hold it for any length of time, locked up against the claims of all others. According to this doctrine, an execution for $1,000 may hold property worth $10,000, for an indefinite time. It is well known, that the sheriff always seizes the whole, and makes an inventory, affixing a small value upon the goods levied on; so that the debtor cannot dispose of any of them, nor can any other creditor satisfy his execution, whilst the first levy subsists. In order, however, to get over this difficulty and its consequences, it was suggested, that in Pennsylvania there was a practice understood to be law, that when a second or later fi. fa. came into the hands of another officer, he might seize the same goods taken on the prior execution or executions, make an inventory, and return them, subject to the prior levy. If he could go no further, it is obvious the difficulty is not removed; for the first creditor may not be hastened by this; but the practise was represented as authorising the officer who levied "subject to the prior execution, to take the goods into his own possession, and to sell them on the second or later writ; and after paying over the moneys due on the first executions, to retain the residue on that under which the goods were sold." This has

been denied to be the law of Pennsylvania. Certainly there is no statute which authorizes it; and I make no doubt, if such instances have occurred, they were the result of accommodation, or acquiesced in from mistake of the law—a mere inadvertency; for nothing is clearer to my apprehension, that while the first seizure is in full legal force, that is, as long as the first execution remains upon it, and the property is in the supposed or actual custody of the first officer—any seizure or sale of it by a second officer would be tortious and void. Trover would lie against him, or against a purchaser with notice. It is said by Buller, J., in 4 Term R. 640, that it had been resolved by Holt, C. J., "that goods being once seized and in custody of the law, they could not be seized again by the same or any other sheriff." He cites Holt, 634; 1 Show. 174. The law supposes—so is the command of the writ, and so, if the officer does his duty, is the fact,—that all the goods seized are taken into his immediate and actual custody for sale: he returns them, if not sold "in his hands pro defectu emptorum." They are therefore not liable to any other process so as to be sold by such subsequent process, before the first is executed. The law is, that the officer who seizes must sell, and a venditioni goes to him for that purpose, though there is a method by distringas of compelling a sheriff out of office to assign the goods over to the sheriff in office; but this is for the benefit of the creditor, who has a lien by the seizure.

I admit, that by the delivery of the second fi. fa. the surplus goods are bound to answer that debt, and so all subsequent executions in order of delivery: and after the first is executed, if any goods remain, they, as the debtor's property, may be seized and sold to satisfy the subsequent creditor. But after the first seizure, no other can be made on the same goods, until the first execution is satisfied, or otherwise becomes void by the laches of the party; and then the writ, which was delivered after, may be executed upon the same goods by seizure and sale, if they remain in the actual possession or power of the party. The only question in this case is, whether the first levy or seizure really exists in law, or stands in the way of the second writ, issued by the United States. I am of opinion, from the facts stated in this case, that it does not. The plaintiff assented to and approved of the execution remaining unexecuted, and the goods, with his assent and approbation, were left in the possession of the debtor, as before; and that, too, for many months, without any apparent difficulty, or any necessity for the delay. I am of opinion, that any suspension of the execution, by the voluntary interference, or even voluntary delay of the creditor is a waiver of his priority: he loses the benefit which the law confers on the writ first delivered; and if a second fi. fa. comes in during this suspension, and finds the property in the hands of the debtor, that second writ obtains the prefer-ence, and is in law the writ first delivered; inasmuch as the other became fraudulent and void, being merely colorable so far as respected an actual execution.

In the case of Bradley v. Wyndham (Anno, 1743) 1 Wils. 44, the plaintiff got out an execution and a warrant to a bailiff to execute it, who on the 14th of May, did make a seizure, but it appearing that the plaintiff's attorney told him to use defendant kindly, and not to take any of his household goods, in consequence of which the bailiff made a mere nominal seizure, leaving defendant in full possession. On these facts a second fi. fa. which came out six days later, and on which the goods were seized and sold, was supported, the jury holding the first fraudulent, and the court refused to set aside the verdict. In that case the debt was bona fide, and the judgment and execution also; but the plaintiff lost his preference by delaying the execution, and leaving the goods in possession of the debtor. In West v. Skip (Anno, 1749) 1 Ves. Sr. 245, 246, Lord Hardwicke held that an elegit lost its preference, as against the assignees of a bankrupt, the plaintiff having left the goods in the possession of the debtor; his words are, "for the sisters on the elegit do not take possession of the goods, but leave them absolutely with the Harwoods, the question therefore arises, whether by this clause (21 Jac. 1., 19,) they are not excluded, being either a plain consent, or great laches:" he then adds, "and it holds more strongly against a creditor by execution than any other, for if a creditor by fi. fa. seizes the goods of the debtor, and suffers them to remain long in the debtor's hands, and another creditor obtains a subsequent judgment and execution, it has been determined often, that it is evidence of fraud in the first creditor, and the goods in the hands of the debtor remain liable." In Smallcomb v. Buckingham, 1 Salk. 320, and in several other books, all the reports agree in the court's laying down this position: If two executions come to a sheriff on same day, he should execute the one first delivered; yet if he execute the second, the sales will be good, and the second creditor will be entitled to the money—but the first creditor may have his action against the sheriff; yet, say the court, this action may be defeated, if the sheriff can show that there were laches, or designed delay on the part of the first execution creditor. In Rice v. Serjeant (1703) 7 Mod. 37, 38, which case has never been denied, the law is put in so many words: "A man has a judgment for a just debt against A, and takes out a fi. fa., and gets the sheriff to seize the goods, but would not let him proceed further: B. who has also a judgment for a just debt against A., takes out a fi. fa. against him, and the question whether he could seize on the same goods, and Per Cur. he may, for the former was a fraudulent execution, and the sheriff might very well return nulla bona on the first execution." The case here puts it, that

the first plaintiff would not let the sheriff proceed further: that can only be understood to mean that he voluntarily suspended or stayed proceedings, for it would have been out of the power of the plaintiff to have prevented the sheriff from selling if he had chosen so to do.

There can be no question that the common law is such as is laid down in these cases. In Pennsylvania, no doubt, some relaxation has been indulged, but I believe the law has not been altered. no solemn decision on the very point brought forward in this case has been given. In Chancellor v. Phillips [supra], cited from a note at the bar, it was decided in the supreme court, that leaving the goods with the debtor, was fraudulent as against bona fide purchasers from the debtor, and that such purchasers should be protected against the execution creditor and sheriff. This was going nearly the length of my opinion in this cause. If the creditor by execution, loses his lien by delay, and suffering the property to remain with the debtor, as against a subsequent purchaser from the debtor, I see not why he may retain it under the same circumstances against a bona fide seizure on a second execution; a purchaser of the debtor has equal means of notice of the lien, as the second execution creditor; for the judgment and execution being of record, are as much accessible to the one as the other: and though the subsequent purchaser pays money, it may be that the second execution creditor's debt arose in consequence of trusting to the apparent property of the debtor, and his apparent ability to proceed in business: and though it should happen that the debt of the last execution creditor had arisen before that of the first, still he might have suffered it to rest, or found other means of satisfaction, after the execution of the first creditor was levied, from perceiving the property to remain with the debtor, and therefore supposing either that no seizure existed. or that the debt was satisfied.

In the same case of Chancellor v. Phillips, Mr. Ch. Justice Shippen, is reported to have said, that the usage in favour of the debtor's possession after a fi. fa. had been principally restricted to furniture. from motives. of humanity. This was evidently frittering down the usage to a mere nothing;—nor do I perceive the reason of this exception in favour of furniture. But how long may this permission continue? Certainly there must be some limit. In short, I believe the state courts will endeavour to get rid of this inconvenient and irregular usage, as fast as possible. I am sure that the ancient common law is the best, and safest, and plainest rule for us all. It is better for creditor and debtor, for the officer and the public, that judgments and executions should be executed, and that if one creditor delays, the next may come in and be paid.

Upon the whole, I feel satisfied. that while we lay down the rule in this case, we are pronouncing a judgment conformable to law. and which may in its consequences tend much to promote repose and security.